Gray, J.
(dissenting)—I think that upon the case as made the court should have dismissed the complaint. It is true that there was proof of the negligence of the defendant. Indeed, it is not disputed by his counsel but that the jury would have been warranted in finding that his vessel was in fault. When this case was here before, 104 N. Y., 86; 5 N. Y. State Rep., 545, it was held that the defendant’s yacht was a coasting steam vessel, and bound as such to carry what are known as central range lights. Her failure to do so was an act of omission which charges her owner with a liability as for negligence. But it was not enough that she should be proved to have been in fault It was incumbent upon the plaintiffs to establish their own freedom from charges of negligent acts, and, if the proof upon which they rested their right to recover disclosed any act clearly contributing to the result, they should have been non-suited. The question of concurrent negligence is generally one for the jury to pass upon; but where facts are undisputed, the question of the plaintiff’s contributory negligence may become a question of law for the court.
Now, in this case the contributory negligence of the plaintiffs, *689 I think, was shown by the evidence of their own witnesses. This collision occurred on the Hudson river below Rhinebeck. Plaintiffs’ steamboat, the Vanderbilt, was steaming down the river at the rate of about nine miles an hour. Her pilot, Whitaker, says it was a dark, cloudy night, and blowing hard. Ahead of him, down the river, he saw three bright white lights, two low ones and one high one, which he thought were on a tow going south and about a mile distant. When the lights got out of range he used his opera glasses, but he could not make out what the high light was. He saw no colored lights near the high light and the object was off to the westward or right of him. He made up his mind that it was a tow and he laid his course to pass it to the left, or eastward. He next heard one whistle given by the distant vessel, which signified to him that it was an approaching steamer and for each to go to the right. To this course he assented by one answering blast of the whistle.
This vessel was the defendant’s steam yacht “Yosemite,” and at that time, he thought, the vessels were five hundred yards, or fifteen hundred feet, apart. A few seconds after answering the yacht’s whistle, the Vanderbilt’s pilot blew two whistles, signifying that each should go to the left, and they were quickly answered by two whistles from the yacht. The Vanderbilt’s pilot, when he heard them, hove his wheel hard-a-starboard and sheered his boat hard-a-port, or to the left The collision occurred almost immediately, or, as he said, “from the time the yacht gave the two whistles, I don’t think we made three times our length before she struck us.” He says he saw the yacht’s red light about the time he heard her returning his two whistles; that light being carried on the vessel’s port side disclosed to him the positions of the vessels towards each other. When he saw a collision to be imminent, he rang four bells to slow, stop and back. They were then, he thought, not a great ways apart, “it may have been two hundred or one hundred feet.” He assigned as his reason for giving two whistles, after having replied with one whistle to the yacht’s one whistle, that he thought he could not have thrown his boat to the westward and passed on the yacht’s west side without colliding. The yacht struck the Vanderbilt forward of her starboard, or right-hand, gangway, and cut clean through her bow to about the middle of the port, or left-hand, gangway.
It is quite evident that the vessels were approaching each other in an oblique direction; for, according to plaintiffs’ evidence, the Vanderbilt, when her pilot thought he saw a tow ahead of him going south, ported his vessel to pass to the eastward, or left of it, and he kept on going to the eastward. The yacht laid her course to go to the east, or right, of the Vanderbilt, and so signified by her whistle; and as evidence of that course the pilot of the Vanderbilt says he saw her red light at the time of the two whistles. It seems clear enough to me that the Vanderbilt’s pilot violated the established rules for navigation in such cases, and because of that violation the vessel in his charge must be deemed, as matter of law, to have contributed to the occurrence complained of.
*690 According to his statement he was ignorant of what the distant light was and he knew nothing of the other vessel’s course; but supposing it was a- tow, he laid his course somewhat to the eastward to pass by. Then he heard the signal from her of one-whistle, to go to the right of each other, and knowing of the approach of a steamer on his course he at first agreed to her pilot’s signal by giving the appropriate reply; but in a few seconds he gave the signal by two whistles for each to go to the left of the other, and receiving an assent to that, at once hard-ported his vessel, sheering her more sharply to the eastward. He says he could not at first see the yacht’s colored lights, and therefore, and in the absence of her central range lights, could not tell her course; but he did have the one whistle to guide him in the first place and he did see her red, or port light, when the two whistles were given, and thus knew that her port or left side was towards him and that she was approaching him obliquely. Now, what his duty was, under the circumstances, is made clear by reference to the rules and regulations for the government of pilots navigating rivers, etc., which were adopted by the board of supervising inspectors as authorized by the act of congress “ to provide for the better security of life on board of vessels propelled in whole or a part by steam and for other purposes,” approved February 28,1871, and the acts amendatory thereof.
Those rules are controlling in all cases of navigation of steam vessels and have the force and effect of statutes where they do not conflict with any special rule, duly made by local authority, relative to inland or river navigation. Their violation should be chargeable as a fault; for obedience to them is not only necessary but insures safety.
We understand the defendant’s counsel to concede the binding force of these rules. I will - cite here two of those rules which are-applicable, in my opinion, to the state of facts.
Rule I. When steamers are approaching each other “ head and head,” or nearly so, it shall be the duty of each steamer to pass to the right, or port side of the other; and the pilot of either steamer may be first in determining to pursue this course, and, thereupon, shall give, as a signal of his intention, one short and distinct blast of his steam-whistle, which the pilot of the other steamer shall answer promptly by a similar blast of his steam whistle, and, thereupon,, such steamers shall pass to the right, or port side of each other. But if the course of such steamers is so far on the starboard of each other as not to be considered by pilots as meeting “head and head,” or nearly so, the pilot so first deciding shall immediately give two short and distinct blasts of his steam whistle, which the pilot of the other steamer shall answer promptly by two similar blasts of his steam whistle, and they shall pass to the left, or on the starboard side of each other.
Rule IIL If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubtsh all immediately signify the same by giving several short and rapid blasts of the steam *691 whistle; and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered, and understood, or until the the vessels shall have passed each other.
We must assume that from the absence of central range lights, and the inability to see the colored lights on the Yosemite, the Vanderbilt could not determine what she was, or what her course; and equally must we assume that to the Yosemite the Vanderbilt and her conrse were known by the lights she carried. Therefore, when the pilot of the yacht gave one blast of the whistle he did so with all the knowledge possible in such cases, and was first in deciding upon the course of passing to the right, or the port side of the other.
Under rule I, this decision, having been assented to, determined a course for both vessels. In subsequently deciding to take the opposite course, that is to go to the left, or the starboard side of the other, the Vanderbilt’s pilot took the risk of his judgment being right, or better. He must have known that to the stranger vessel his position and course were indicated by his vessel’s light; while he himself was, if he is to be believed, ignorant of the yacht’s. How was not his duty, under the circumstances, defined unmistakably by the rules by which he was to be governed ? He could do one of two things. He could, and as I think should, have adhered to his agreement with the yacht’s master to go to the right of each other. Or, under rule IH, if he failed to understand the course or intention of the yacht, “ whether from signals being given, or answered erroneously, or from other causes,” he could have -given several short and rapid blasts of the whistle and slowed down until the proper signals were given or understood, or the vessel had passed. Under the state of facts the Vanderbilt’s pilot had no right to give the two signals, after he had assented to the course- indicated by one whistle, and when he was as yet in the dark as to any other indication of the yacht’s existence or course. It may well be that the yacht should not have answered the two whistles and thus assented to the change in the course; but that cannot affect the Vanderbilt’s responsibility for the change. The Vanderbilt, in subsequently giving the two blasts of the whistle, thereby notified, the approaching vessel that she, the Vanderbilt, could keep out of the way by going to the left, and would do so, if the other would agree to it, and the yacht’s assenting blasts simply meant that it agreed to that; the risk to be the Vanderbilt’s. If the Vanderbilt’s pilot had obeyed the rule of the road, as laid down by the statutes of the state, and of the United States, and adhered to his agreement with the approaching vessel, and had kept to the right, either the collision would not have happened, or, if it had happened, the Vanderbilt would not have been in fault.
In the absence of the expected and usual signals, a pilot should not be governed by impressions. If in the exercise of discretion he departs from the rules in such cases, in the absence of any necessity, and a collision is enabled to occur, he does so at his *692 peril and at the risk of charging his vessel with a liability. If it is claimed that if the Vanderbilt’s pilot committed a mistake, it was one in extremis, it should appear that his faulty manoeuvre was caused by the error of the other vessel. 112 U. S., 514. But there was no such producing cause in this case; for the Vanderbilt’s pilot says he could only make out the one high light before he heard the one whistle and only saw the red light, which indicated her port side was towards him, about the time of the two whistles.
The manner in which the yacht cut through the Vanderbilt’s bow presents to my mind some evidence „that the yacht was attempting to comply with the Vanderbilt’s signal to pass to the left. The evidence shows that the yacht’s bow struck the Vanderbilt forward of her starboard gangway, cut through and came out about the middle of her port gangway. The Vanderbilt’s course was at the time sharp to the eastward. If the yacht had kept on pointing to the eastward, with the object of passing to the right of the Vanderbilt, they would have met on oblique courses and the yacht would have cut through the other vessel on a line which would have taken her to a point forward of the Vanderbilt’s port gangway. But it is evident from the fact of the line of the cutting through terminating at a point in the middle of the port gangway that the yacht’s pilot had already ported his vessel’s bow and attempted to comply with the changed signal.
In the case of the City of Hartford, 11 Blatchford C. C. Rep., 72, after that vessel had blown one whistle, for each to go to the right,;the approaching vessel, the “Unit,” blew two, for each to go to the left, and the City of Hartford assented to the changed course. Judge Woodruff in his opinion agreed with the court below that she ought not to have done so; that she ought to have kept off, or stopped He held that “ manoeuvre was fatal. In the most favorable view for the Unit, the approaching vessel, it was an error in which both concurred." He decided that “the conclusion seems inevitable that both were in fault.”
It is suggested in the general term opinion that the pilot of the Vanderbilt was bewildered. It may be. It is not disputed that the yacht was in fault; but under the third rule, which we have quoted, if the pilot was bewildered and failed to understand the other vessel’s course or intention, he should have signified to that effect by the repeated short blasts and have slowed down or stopped. The Vanderbilt’s pilot forgot or disregarded the rules, and his mistake must be regarded as having contributed to the occurrence.
I think the judgment and order denying a new trial should be reversed and a new trial ordered; costs to abide the event.
Judgment affirmed, with costs.
All concur, except Gray, J., dissenting.